# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs March 2, 2010

## STATE OF TENNESSEE v. MARK HINES

**Appeal from the Criminal Court for Shelby County**
**No. 08-01693     W. Otis Higgs, Jr., Judge**

---

**No. W2009-00450-CCA-R3-CD  - Filed October 27, 2010**

---

The Defendant, Mark Hines, was found guilty by a Shelby County Criminal Court jury of criminal attempt to commit second degree murder. See T.C.A. §§ 39-13-210(a)(1), 39-12-101(a)(2), -(3) (2006).  He was sentenced as a Range I, standard offender to ten years' confinement in the Department of Correction.  On appeal, he contends that (1) the evidence is insufficient to support his conviction, (2) the trial court erred by permitting the State to introduce prejudicial demonstrative evidence to the jury, (3) the trial court erred by admitting testimonial hearsay into evidence, (4) the trial court erred by giving incorrect and incomplete jury instructions, and (5) he was improperly sentenced.  We affirm the conviction, but we reverse the sentence and remand the case for resentencing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part and Reversed in Part; Case Remanded.**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Robert Wilson Jones, District Public Defender; and Phyllis L. Aluko (on appeal) and Timothy J. Albers (at trial), Assistant Public Defenders, for the appellant, Mark Hines.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; William L. Gibbons, District Attorney General; and Hamilton Douglas Carriker and Kate Edmands, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

This case relates to an altercation in which the Defendant shot Cornell Richardson five times. The victim testified that he and the Defendant were close friends. He said they often spent time together at their respective homes. He said he frequently loaned his car to the Defendant. He said the Defendant damaged his car but agreed to pay for repairs at E & P Body Shop. The victim said he received a telephone call from the body shop one week after the accident, informing him that his car was repaired. He stated that his car remained at the body shop because the Defendant was unable to pay for the repairs at the time but that he believed the Defendant would eventually pay for the repairs. He said he continued to spend time with the Defendant after the accident because he "had no reason not to be on good terms with him because . . . he said he was going to pay for it."

Mr. Richardson testified that he called the Defendant a few weeks after the car accident and arranged to stop by the Defendant's house in order to avoid shopping with his girlfriend and his mother. He said that he walked to the Defendant's house just as the sun was going down and that the Defendant invited him inside. He said the Defendant accused him of not believing that the Defendant would pay for the car repairs. He stated the argument escalated when the Defendant began yelling and pushed him. He said that he pushed the Defendant back and that the Defendant called his brother, Bronco, and told Bronco that he and Mr. Richardson were fighting. Mr. Richardson said he left the Defendant's house to avoid a fight. He stated he was unarmed and did not own a gun. He said that he met Bronco and two other men in the driveway and that Bronco urged them to stop fighting because they were best friends. Mr. Richardson said his friend "J ", Bronco, Wesley Faulkner, an unidentified man, and the Defendant were present at this time. He stated that the Defendant tried to punch him but missed and that he then hit the Defendant. He said that the Defendant fell into him, causing the two men to fall, and that he hit the Defendant in the chest. He said Bronco broke up the fight and the Defendant went into his house. He stated that he attempted to walk away but that he heard the Defendant leave his house and say, "I'm fixing to kill this b****." He said the Defendant shot him five times with a revolver, including shots to his arm, shoulder, and once in his back as he ran away.

Mr. Richardson testified that he ran next door and called his girlfriend, his son, and 9-1-1. He said a police officer and an ambulance arrived minutes later. He said he stayed in the hospital for more than a week with a collapsed lung, a broken rib, and bullets remaining in his body. He stated that a police officer, Detective Robert Wilkie, visited him at the hospital and asked him to look at photographs and identify anyone he recognized. He said he recognized the Defendant in one of the photographs, circled the Defendant, and wrote, "this is who shot me."

On cross-examination, Mr. Richardson testified that his car had been damaged and repaired shortly before the Defendant damaged it. He said that the Defendant drove the car the first time it was damaged and that they both received a settlement for the wreck. He said the Defendant agreed to pay for the repairs to his car after the second wreck. He said not having a car was not a problem because his girlfriend drove him.

Mr. Richardson testified that on the night of the shooting, he went to the Defendant's house after calling him on the telephone. He said he walked up to the open front door and could see the Defendant and his son through the closed screen door. He said he was unarmed and did not own a gun. He stated he thought the initial argument would "blow over just like any other argument." He said the Defendant pushed him and he pushed back. He said he walked outside after the Defendant called Bronco. Mr. Richardson stated that he did not leave at that time because Bronco and two other men arrived and because "it wasn't supposed to get this far . . . ." He said that the Defendant swung at him and missed and that he then hit the Defendant. He would not agree that he pulled a gun on the Defendant at this point or that he hit the Defendant with a gun. He said the Defendant shot him as he ran away. He stated that when the police arrived, he told them the Defendant shot him.

Mr. Richardson testified that on December 7, 2007, a few weeks after the shooting, he was arrested because his ex-wife accused him of pointing a gun at her. He stated that he was stopped by authorities and a gun was found in the car, but that the gun was not his.

On redirect examination, Mr. Richardson testified that he was not convicted for the December 7, 2007, incident. He said that his wife asked him to pick up their children that evening but when he arrived with his girlfriend, Monica Jones, his ex-wife "blew up" and had him arrested. He stated the case was dismissed because his ex-wife recanted her accusation.

Wesley Terrell Faulkner testified that he knew both the Defendant and the victim. He stated that he knew Julius "Bronco" Smith and that he and Bronco were close friends. He said that on the night of the shooting, he and Bronco were playing video games at home when the Defendant called. He said all the men at Bronco's house went to the Defendant's house, which was only a few minutes away. He said the Defendant and victim were wrestling outside when they arrived. He stated he did not see the victim with a weapon. He said the Defendant went into his house and returned, stating, "I'm fixing to kill this mother f*****." He said he heard five shots fired as he ran away.

On cross-examination, Mr. Faulkner testified that he did not know what was said during the phone call between Bronco and the Defendant. He stated that when they arrived at the Defendant's house he stood back and did not involve himself in the altercation. He

said that he could not see a gun in the Defendant's hand but that he knew the Defendant had a gun when he came from his house. Mr. Faulkner stated he heard the gunshots and saw the Defendant shooting as he ran away. He said he ran away and did not return to the scene. He said he did not contact the police to tell them he was a witness until months after the shooting.

On redirect examination, Mr. Faulkner testified that he did not speak with police on the night of the shooting because he was terrified. He said he eventually contacted the police because it was "the right thing to do. . . ." He said he was closer with the Defendant's family than with the victim.

Monica Jones, the victim's girlfriend, testified that the Defendant and the victim were close friends who spent time together daily. She said she was with the victim when he learned that his car was damaged. She said the Defendant and the victim had no hard feelings over the damage because the Defendant said he would pay to fix the car. She stated the Defendant and victim continued to be friends and spend time together after the car accident. She said she never heard the victim complain about the Defendant's failure to pay for the repairs.

Ms. Jones testified that on November 15, 2007, she and the victim's mother went shopping and that the victim went to spend time with the Defendant. She said the next time she saw the victim, he was in the hospital "in very serious condition."

On cross-examination, Ms. Jones testified that she was not present during the shooting. She said she did not see the victim until after the shooting when he was in the hospital.

Memphis Police Officer Donovan Lee Tabler testified that on November 15, 2007, he responded to a shots-fired call at the Defendant's home. He said that he arrived when it was dark, sometime between 7:00 p.m. and 8:30 p.m. He stated that the victim was sitting on the neighbor's porch and said the Defendant shot him. Officer Tabler said he saw blood coming from the victim's chest and around the area where the victim sat.

Officer Tabler testified that he spoke with a friend of the Defendant at the scene. He asked the friend to call the Defendant. He said he spoke with the Defendant, who was cooperative over the phone. He said he identified the Defendant as the speaker on the other end by asking him his name and date of birth and obtaining this information. He stated that after "I got information on him on the telephone, date of birth, I asked him what happened." He was told by the Defendant that he and his friend "got into it" and that the situation "got out of hand."

On cross-examination, Officer Tabler testified that he was the first officer on the scene. He said he made sure that the victim was all right and then secured the crime scene around the porch where he found the victim. He said the only person in that area was the victim.

Memphis Police Officer James K. Smith testified that he was a crime scene investigator responsible for collection, preservation, and documentation of evidence. He said that on November 15, 2007, he was dispatched to the Defendant's home. He said that it was dark when he arrived, between 9:00 and 10:00 p.m., and that neither the victim nor the Defendant was present. He said he did not find any shell casings or a gun. He said the lack of casings indicated that the weapon used was a revolver or that the casings were retrieved.

Memphis Police Officer Robert Wilkie testified that he was an investigator with the felony assault unit. He stated that he created a photographic lineup containing a picture of the Defendant and other individuals and that he brought this lineup to the hospital to show the victim. He stated that before showing the lineup to the victim, the victim told him the Defendant shot him. He said the victim identified the Defendant in the lineup. He said the victim was hesitant to prosecute his friend.

Officer Wilkie testified that the victim reported going to the Defendant's home on the night of the shooting. He said the victim stated that he refused the Defendant's request to borrow five dollars because the Defendant had not paid for the car repairs. Officer Wilkie stated the victim told him that a fight ensued, that the Defendant called his brother, and that the fight moved outdoors. He said the victim told him the Defendant went inside; returned with a gun; stated, "I'm going to shoot this bitch"; and shot the victim.

Officer Wilkie testified that the victim reported that "Bronco" and "Wesley" witnessed the shooting. However, the victim was unable to provide their last names or addresses. Officer Wilkie said he was unable to contact the witnesses without more information.

The Defendant testified that he and the victim were friends and often spent time together at each other's homes. He stated that he damaged the victim's car and that he agreed to pay E & P Body Shop to repair the car. He said he did not pay the body shop for the repairs because the car was not ready and because the victim wanted his car repaired properly. He said that the victim grew impatient about the status of his car but that he and the victim never argued about the repairs.

The Defendant testified that on the night of the shooting, he and his son were asleep in the living room. He said he put his son to bed at 8:00 p.m each night because it enabled

his son to perform better in school. He said the victim entered his home through an unlocked and open side door and did not call before he arrived. He said the door was open because he called his brother earlier and expected his brother to arrive soon. He stated the victim began kicking him in the face as he slept. He said that he ran out of the house and that the victim chased him into the front yard and continued to beat him. He said he was not able to defend himself.

The Defendant testified that he did not have a revolver at his house and that he did not enter his house after the victim began beating him outside. He said that the victim took out a revolver when Bronco attempted to break up the fight and that the victim beat him with the gun and dropped it during the fight. He said that he was on the ground when he grabbed the victim's gun and shot the victim in self-defense. He said he feared for his life because the victim "just snapped" and was "in a rage."

The Defendant testified that he ran away after he shot the victim. He stated that an officer called him on the telephone and asked him what happened. He said he replied that he and the victim fought and "things got out of hand. . . ." He said he turned himself in to the police four or five days after the shooting.

The Defendant testified that the victim often carried guns. He stated the victim used guns to threaten people.

On cross-examination, the Defendant testified that he fell asleep while waiting for his brother. He said that his son fell asleep around 8:00 p.m and that he fell asleep around 9:00 p.m. When reminded that officers previously testified that they investigated the scene around 9:00 p.m., he maintained that he did not fall asleep around dusk. After being told that 9-1-1 calls from the victim were logged at 6:35 p.m., the Defendant said he might have fallen asleep earlier.

The Defendant testified that he did not know the victim was coming to his home and that he did not let the victim into his home on the night of the shooting. He said he slept for twenty or thirty minutes before he was attacked. He stated he awoke when the victim kicked him in the head. The Defendant testified that the fight continued outside and that the victim hit him in the head with a gun. He said that the victim dropped the gun and that he grabbed it. He stated he did not say anything before shooting the victim. He agreed that he shot the victim once in the back. He said that he was terrified of the victim and agreed that he remained terrified as the victim ran away.

The Defendant testified that he ran away and that he left the gun at the scene. He said he hid because he was scared. He said he received a phone call from a police officer while

-6-

he hid. He agreed that he told the officer things "got out of hand and we had been in a fight." He could not remember if he told the officer that the victim pulled the gun on him.

The Defendant testified that he and the victim never argued about the car and that it made no sense for the victim to attack him that night because the victim was not upset about the car. He said that during the fight, he was kicked and beaten in the head with a gun. He said he did not seek medical treatment for his injuries.

The Defendant testified that he did not own a gun because he had "a terrible record." He admitted that he was previously convicted of theft of property over $500 and that felons were not allowed to own guns.

The jury found the Defendant guilty of criminal attempt to commit second degree murder. The trial court sentenced the Defendant to ten years in the Department of Correction.

# I

The Defendant contends that the evidence is insufficient to support his conviction because the evidence did not sufficiently rebut his claim of self-defense. The State contends that the evidence was sufficient to support the Defendant's conviction for criminal attempt to commit second degree murder. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). This means that we may not reweigh the evidence but must presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. <u>See</u> <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997).

As pertinent to this appeal,

> (a) Second degree murder is:
> > (1) A knowing killing of another.

T.C.A. § 39-13-210(a)(1) (2006). With regard to criminal attempt:

(a) A person commits criminal attempt who, acting with the kind
of culpability otherwise required for the offense:

. . .

(2) Acts with intent to cause a result that is an element of the
offense, and believes the conduct will cause the result without
further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a
result that would constitute the offense, under the circumstances
surrounding the conduct as the person believes them to be, and
the conduct constitutes a substantial step toward the commission
of the offense.

Id. § 39-12-101(a)(2)-(3) (2006). A person acts knowingly with respect to the result of his
conduct when he is aware that his conduct is reasonably certain to cause the result. Id. § 39-11-106(a)(20).

Taken in the light most favorable to the State, the victim testified that the Defendant
invited him into his home and that a fight began. The fight moved outside, and the
Defendant returned inside. The Defendant emerged with a revolver, stated he would kill the
victim, and shot the unarmed victim five times. Mr. Faulkner testified that he saw the
Defendant and victim wrestling. The Defendant went into his house, returned, and stated that
he would kill the victim. Mr. Faulkner heard five gunshots and saw the Defendant shoot the
victim as Mr. Faulkner ran away. He did not see the victim with a weapon. Officer Tabler
spoke with the Defendant on the telephone shortly after the shooting. The Defendant told
Officer Tabler that he and the victim fought and that things "got out of hand" but did not tell
him that the victim pulled a gun on the Defendant.

We conclude that a rational trier of fact could have found the elements of criminal
attempt to commit second degree murder beyond a reasonable doubt. We hold that the
evidence is sufficient to support the Defendant's conviction.

**II**

The Defendant contends that the trial court erred when it allowed the victim to lift his
shirt and show the jury his bullet wound scars. He contends the prejudicial value of this
evidence substantially outweighed its probative value because the victim already pointed to

the areas where he was shot. The State contends that admission of this evidence was proper. We agree with the State.

At trial, the victim pointed over his clothing to the areas where the Defendant shot him. The State sought to have the victim lift his shirt and identify the locations of his wounds. The Defendant objected to the victim showing his scars, arguing that the victim "already pointed out where they are." The trial court overruled the objection. The victim lifted his shirt and pointed to his scars, indicating the order in which he was shot.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Prejudicial evidence is not excluded as a matter of law. State v. Carruthers, 35 S.W.3d 516, 577 (Tenn. 2000) (citing State v. Gentry, 881 S.W.2d 1, 6 (Tenn. Crim. App. 1993)). The term "undue prejudice" has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Comm'n Notes). The trial court's decision to admit or exclude evidence will be overturned on appeal only when there is an abuse of discretion. See State v. Samuel, 243 S.W.3d 592, 599 (Tenn. Crim. App. 2007).

Here, the scars corroborated the victim's testimony that he was shot five times and that one of the bullets hit him in the back. Thus, this evidence was relevant to illustrate the victim's testimony. Additionally, the record does not indicate that the scars were particularly offensive or likely to suggest a decision on an improper or emotional basis. We conclude that the probative value of showing the bullet wounds was not substantially outweighed by the danger of its prejudicial effect. The trial court did not abuse its discretion in allowing this demonstrative evidence.

## III

The Defendant contends that the trial court violated his Sixth Amendment right of confrontation by allowing Officer Tabler to testify that an unidentified person called the Defendant and gave the telephone to Officer Tabler. The Defendant also contends that the trial court erred by admitting inadmissible hearsay when it allowed Officer Tabler to testify that the Defendant told him on the telephone that "him and his friend got into it" and that the situation "got out of hand." The State contends the Defendant waived the Confrontation Clause issue by failing to raise it in his motion for a new trial and that the court properly

allowed the testimony as an admission of a party opponent. We agree with the State that the trial court properly admitted the evidence.

As a preliminary matter, we note that the Defendant waived all issues concerning a violation of the Confrontation Clause by failing to state these grounds in his motion for a new trial. See T.R.A.P. 3(e). The Defendant asks us to consider this issue in the interest of justice as plain error. See T.R.A.P. 36(b).

Our supreme court has adopted the factors developed by this court to be considered

> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The record must establish all five factors before plain error will be recognized and "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283. In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the [proceedings]," and "recognition should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." Adkisson, 899 S.W.2d at 642.

With respect to the trial court's allowing Officer Tabler to testify that an unknown person called the Defendant and gave him the phone, the Defendant has failed to show that consideration of this error, if any, is necessary to do substantial justice. The record reflects that the admission of this testimony did not change the outcome of the proceedings. Officer Tabler's testimony regarding the actions of the unidentified person was not essential for the jury to establish that he spoke with the Defendant on the telephone. Officer Tabler established the Defendant's identity by asking for his name and birthday and obtaining this information from the Defendant. Likewise, the Defendant has failed to show that admitting this testimony adversely affected a substantial right of his. The Defendant testified that he spoke with Officer Tabler on the telephone shortly after the shooting, thus removing any

-10-

adverse affect that the officer's testimony may have had. We hold that the trial court did not commit plain error on this issue.

We now turn to the Defendant's contention that the trial court erred by admitting inadmissible hearsay. Hearsay is an out-of-court statement offered in court "to prove the truth of the matter asserted." However, Tennessee Rule of Evidence 803(1.2), provides

> Hearsay Exceptions.-The following are not excluded by the hearsay rule:
>
> . . . .
>
> (1.2) Admission by Party-Opponent.-A statement offered against a party that is (A) the party's own statement in either an individual or a representative capacity . . . .

The Defendant's statements, both written and oral, are admissible under this exception, subject to Tennessee Rules of Evidence 401 and 403. See State v. Binion, 947 S.W.2d 867, 874 (Tenn. Crim. App. 1996); see also Neil P. Cohen et al., Tennessee Law of Evidence, § 8.06[3][c], at 8-41 (4th ed. 2000).

Here, the trial court allowed Officer Tabler to testify that he spoke with the Defendant on the telephone and was told by the Defendant that "him and his friend got into it" and the situation "got out of hand." This was the Defendant's own statement offered against him and was properly admitted into evidence as an admission of a party opponent. See Tenn. R. Evid. 803(1.2).

## IV

The Defendant contends that the trial court erred by giving incorrect and incomplete jury instructions because the trial judge (1) failed to follow pattern jury instructions on second degree murder and then instructed the jury to consider second degree murder and voluntary manslaughter sequentially, (2) omitted a portion of the self-defense instruction, and (3) did not give the jury a supplemental instruction defining "passion" and "provocation." The State contends that the jury instructions were proper.

As a preliminary matter, we note that the Defendant waived all issues concerning the jury instructions by failing to state these grounds in his motion for a new trial. See T.R.A.P. 3(e). The Defendant asks us to consider these issues in the interest of justice as plain error. See T.R.A.P. 36(b).

-11-

# A

The Defendant contends the trial court erred when it defined the distinction between second degree murder and voluntary manslaughter after it instructed the jury on voluntary manslaughter and reckless endangerment, instead of following the pattern jury instructions and defining the distinction immediately after the second degree murder instruction. See T.P.I.- Crim. 7.05 (11th ed. 2007). The Defendant contends that this confused the jury and that the trial court's instruction for the jury to consider the charges sequentially precluded the jury from returning a conviction for attempted voluntary manslaughter. The State contends that the jury instructions were proper and do not amount to plain error. We agree with the State.

In pertinent part, the trial court charged the jury:

> When you first retire to consider the verdict, you will first inquire, is the Defendant guilty of attempted murder second degree as charged in this indictment.
>
> . . .
>
> If you find the Defendant not guilty of this offense or if you have a reasonable doubt of his guilt of this offense, you will acquit him thereof and then proceed to inquire whether or not he is guilty of attempted voluntary manslaughter. . . .

Relevant to this case, second degree murder is the unlawful and intentional or knowing killing of another. See T.C.A. §§ 39-13-201, -210. Voluntary manslaughter is the unlawful and intentional or knowing killing of another while "in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211. Thus, the elements for second degree murder must be proved for voluntary manslaughter as well. The Defendant argues that requiring the jury to acquit on the greater offense before considering the lesser offense is troublesome when the offenses charged include second degree murder and voluntary manslaughter.

Sequential offense instructions have been approved in Tennessee. Our supreme court has held that

> where a criminal defendant is entitled to jury instructions on lesser-included offenses, the trial court shall instruct the jury to consider the offenses in order from greatest to least within each

-12-

> count of the indictment and that it shall not proceed to consider any lesser-included offense until it has first made a unanimous determination that the defendant is not guilty of the immediately-preceding greater offense.

State v. Davis, 266 S.W.3d 896, 910 (Tenn. 2008) (stating that significant policy considerations favor the use of sequential, acquittal-first jury instructions).

The record reflects that before the jury's deliberations, it was fully and accurately instructed concerning the difference between second degree murder and voluntary manslaughter, although the trial court gave the instructions in a different order than the pattern jury instructions. This court has upheld sequential jury instructions when the distinction between second degree murder and voluntary manslaughter was placed after the voluntary manslaughter charge. See State v. Billie Joe Welch, No. E2005-02293-CCA-R3-CD, Roane County, slip op. at 14 (Tenn. Crim. App. Sept. 26, 2006), app. denied (Tenn. Feb. 26, 2007). Although the better practice would be to adhere to the approach in the pattern jury instructions, no clear and unequivocal rule of law was breached, and the Defendant has not shown that a substantial right was adversely affected. We hold that the Defendant has not shown plain error.

**B**

The Defendant contends the trial court erred when it omitted the portion of the self-defense instructions that states that a person using deadly force within his home is presumed to have a reasonable fear of imminent death or serious bodily injury when the deadly force is used against a non-family member who enters or has entered the home unlawfully and forcibly. See T.C.A. § 39-11-611(c) (Supp. 2007) (amended 2008); T.P.I.- Crim. 40.06(b) (11th ed. 2007). The State contends that there was no error because the shooting occurred outside and the victim did not enter the Defendant's home forcibly. We hold that the Defendant has not shown plain error.

In criminal cases, the trial court has the duty to charge the jury on all of the law that applies to the facts of the case. See State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992) (citing State v. Thompson, 519 S.W. 2d 789, 792 (Tenn. 1975)). The defendant also "has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge." Thompson, 519 S.W.2d at 792; see T.C.A. § 39-11-203(c) (2006) (entitling a defendant to have the existence of a defense submitted to the jury when it is fairly raised by the proof). An erroneous jury instruction may deprive the defendant of the constitutional right to a jury trial and is subject to a harmless error analysis. See State v. Garrison, 40 S.W.3d 426, 433-34 (Tenn. 2000).

An instruction on a defense must be given if fairly raised by the proof regardless of whether the defense relies on the theory or requests that an instruction be given as to that theory. See State v. Sims, 45 S.W.3d 1, 9 (Tenn. 2001); see also State v. Allen, 69 S.W.3d 181, 187-88 (Tenn. 2002); Alfonzo Williams v. State, No. W2008-00106-CCA-R3-PC, Shelby County, slip op. at 6 (Tenn. Crim. App. July 29, 2009) (applying the supreme court's holding in Allen to conclude that an instruction on a defense must be given if fairly raised by the proof), app.denied (Tenn. Mar. 1, 2010). "In determining whether a defense is raised by the evidence, the court must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." Sims, 45 S.W.3d at 9 (citing Johnson v. State, 531 S.W.2d 558, 559 (Tenn. 1975); State v. Bult, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998)); see also State v. Shropshire, 874 S.W.2d 634, 639 (Tenn. Crim. App. 1993). If evidence has been presented that reasonable minds could accept as a defense, "the accused is entitled to the appropriate instructions." Johnson, 531 S.W.2d at 559.

A jury instruction must be reviewed in its entirety and read as a whole rather than in isolation. State v. Leach, 148 S.W.3d 42, 58 (Tenn. 2004). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005) (citing State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998)).

The trial court gave self-defense instructions to the jury, including:

> if [the Defendant] acts in self-defense from honest, even though mistaken, convictions as to the extent of danger he will not be held criminally liable for his action. In determining whether the Defendant's use of force in defending himself was reasonable, you may consider not only his use of force but also all the facts and circumstances surrounding and leading up to it . . . If from all the facts and circumstances you find the Defendant acted in self-defense, or you have a reasonable doubt as to whether the Defendant acted in self-defense, you must find him not guilty.

The court also instructed the jury that "If [the victim] had become disarmed or helpless, or all danger to the Defendant had disappeared, then the Defendant's right to self-defense would not justify his further use of force." However, the trial court did not instruct the jury on the presumption of reasonableness accompanying the use of deadly force within a home.

-14-

The Defendant has failed to show that consideration of this error, if any, is necessary to do substantial justice. The court's omission was harmless beyond a reasonable doubt in the context of the entire instruction and did not affect the outcome of the trial. The evidence presented by the State included the victim's testimony about the shooting. The victim's account of the events was supported by other witnesses. The Defendant's testimony was not corroborated by witnesses or other evidence. Moreover, the Defendant testified that he grabbed the victim's gun after it was dropped and admitted that he shot the victim multiple times, including once in the back as the victim ran away. The Defendant's testimony reflected that the victim was disarmed and that the danger to the Defendant had disappeared at the time he shot the victim in the back. This testimony would permit the jury to determine that the Defendant's right to self-defense, if any, did not justify his further use of force when he shot the Defendant in the back. Therefore, the jury instructions and the record as a whole do not reflect that this omission likely misled the jury as to the applicable law or that it changed the outcome of the proceedings. We hold that the Defendant has not shown plain error.

## C

The Defendant contends the trial court erred by not giving the jury a supplemental instruction defining "passion" and "provocation." The State contends that the jury instructions were proper and do not amount to plain error. We hold that the Defendant has not shown plain error.

When giving jury instructions, the trial court has a duty to define statutory terms containing a technical meaning. State v. Raines, 882 S.W.2d 376, 382-83 (Tenn. Crim. App. 1994). When words and terms are in common use and can be understood by people of ordinary intelligence, it is not necessary for the court to define or explain the terms unless the court has obscured their meaning. Id. at 383. This court has held that the word "passion" is in common use and can be understood by persons of normal intelligence. State v. Mann, 959 S.W.2d 503, 522 (Tenn. Crim. App. 1997).

The trial court's instruction regarding the difference between second degree murder and voluntary manslaughter stated:

> If you find beyond a reasonable doubt that the defendant intended to cause the result, the death of a person, and that he did so as a result of a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner, then the killing of another. . . would be voluntary manslaughter.

The trial court was not required to give supplemental instructions regarding the word passion. See id. Additionally, the trial court's instruction adequately covered the definition of provocation, stating that it must be "sufficient to lead a reasonable person to act in an irrational manner." As a result, no clear and unequivocal rule of law was breached because the trial court did not have a duty to give the supplemental instruction and no substantial right of the Defendant was adversely affected. The Defendant has not shown that he is entitled to plain error relief.

## V

The Defendant contends that the trial court erred by refusing to allow him to present evidence at the sentencing hearing and by failing to place its consideration of enhancement or mitigating factors on the record when determining an appropriate sentence. The State concedes this was error, and we agree.

At the sentencing hearing, a court must "afford the parties the opportunity to be heard and present evidence relevant to the sentencing of the defendant." T.C.A. § 40-35-209(b).

At the beginning of the sentencing hearing, the Defendant attempted to present the testimony of four family members and his employer in support of his request for probation and as proof of mitigating factors. The trial court responded that it would not allow the witnesses to testify and suggested that defense counsel tell the court what the substance of the witnesses' testimony would be. The trial court allowed the State to argue for the application of enhancement factors. The trial court then imposed a ten-year sentence without stating on the record which enhancement or mitigating factors it found applicable or how those factors were evaluated in determining the sentence. We hold that the trial court failed to follow the statutory sentencing procedure and did not give due consideration to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act.

In consideration of the foregoing and the record as a whole, we affirm the conviction for attempted second degree murder, but we reverse the sentence and remand the case for resentencing.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE